UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CLEAN WATER OPPORTUNITIES, INC. | * | CIVIL ACTION NO. |
| D/B/A ENGINEERED POLYURETHANE | * | |
| PATCHING SYSTEMS | * | JUDGE |
| | * | |
| VERSUS | * | MAG. JUDGE |
| | * | |
| THE WILLAMETTE VALLEY | * | JURY TRIAL REQUESTED |
| COMPANY | * | |
| | * | |

**************************************************************************

## COMPLAINT

NOW INTO COURT, through undersigned counsel, comes Plaintiff, Clean Water Opportunities, Inc., d/b/a Engineered Polyurethane Patching Systems ("EPPS") who does with respect represent:

## JURISDICTION AND VENUE

1.

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331, 15 U.S.C. §§1 and 2, known as the Sherman Act, and Sections 4 and 7 of the Clayton Act, 15 U.S.C. §§ 15 and 18.  This Court also has supplemental subject matter jurisdiction over any state law claims alleged pursuant to 28 U.S.C. §1367.  This Court also has jurisdiction pursuant to 28 U.S.C. §1332(a) as the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

2.

Venue is proper in this district under 15 U.S.C. §22 because the Defendant transacts business in this district and a substantial portion of the events giving rise to EPPS' claims

occurred in, and a substantial portion of the affected interstate trade and commerce described more fully below, has been carried out within the Middle District of Louisiana.  Additionally, Defendant has formally notified the Louisiana Secretary of State that its registered office in Louisiana is in Baton Rouge and its registered agent for service of process is located in Baton Rouge, Louisiana.

## PARTIES

3.

(a)    Clean Water Opportunities, Inc., d/b/a Engineered Polyurethane Patching Systems ("EPPS") is a Louisiana corporation that transacts business and has its principal place of business in this district;

(b)    The Willamette Valley Company ("Willamette") is an Oregon corporation with its principal place of business in Eugene, Oregon.  Willamette is a privately owned multi-national corporation that manufactures and distributes a variety of products and services throughout the United States, Europe, Canada, Asia, and South America.  Material to this litigation, Willamette is the manufacturer of polyurethane filling and patching materials ("Patch") used in the plywood manufacturing business.  Willamette maintains one of its manufacturing plants in Pineville, Louisiana.

## MARKET PRODUCT DEFINITION

4.

The market product at issue in this litigation is known as "patch."  Patch is a two-part polyurethane wood filler.  Patch part "A" is the polyurethane intermediary.  "A" patch has as its base chemical a version of "polyol" (poly-propylene glycol) which has molecules that have from one to five or more ends terminating in an OH group (oxygen-hydogen).  "B" patch, or patch

2

part "B," is one of a group of chemicals referred to as isocyanates (methyl di-phenyl diisocyanate or polymeric MDI). Isocyanates have two or more molecular ends that terminate in NOH groups (nitrogen-oxygen-hydrogen).

5.

Patch is used in the "patch line" in the mill production of plywood where plywood panels (sheets of plywood) are machine-fed onto a conveyor chain at the rate of 6 to 12 per minute. The panels pass a routing station where the knots are routed out, then a few feet further down the line, the patch operator, or "patcher," applies the patch to the knot holes using a hand-held, two-part mixing valve, or a "patch gun," through an aluminum tube with a static mixing element inside (patch tube).

6.

For purposes of this litigation, "Patch" is the market product. Patch is sold to plywood manufacturers on a per-gallon price basis but included in the price is the use of the patch seller's application equipment. The patch seller not only provides the application equipment that is to be used by the purchaser's employees, but it also services said equipment.

**PRODUCT GEOGRAPHIC MARKET**

7.

The geographic product market for Patch as it relates to the Plaintiff's business is defined as plywood manufacturers who utilize Patch in the manufacturing process within a 500-mile radius around Baton Rouge, Louisiana. This includes portions of the states of Louisiana, Texas, Mississippi, Alabama, Florida, and Arkansas.

## FACTUAL BACKGROUND

### 8.

In 1990, the principal owner of EPPS, David E. Edwards ("Edwards"), entered into the business of supplying polyurethane plywood patch (Patch) to plywood mills that manufacture specialty grade plywood, *i.e.,* "B" of "A" grade.   The market for Edwards' company, EML Enterprises, was primarily in the Texas, Arkansas, Louisiana, Mississippi, and Alabama region. At that time, Willamette was in the same market and had competition from other entities such as Georgia Pacific and Champion Wood Products. These entities were in the Patch marketplace throughout the country.   In the early 1990s, Willamette purchased Georgia Pacific's chemical division's patent on Patch and thus removed Georgia Pacific from the market.   Upon information and belief, in the mid-1990s, Willamette acquired Champion Wood Products, and by 1997 or 1998, Willamette and Edwards' company were the only competitors in the defined geographic patch market.

### 9.

In July 2000, Edwards' company, EML Enterprises, was selling Patch out of its plant in Port Allen, Louisiana, and enjoying approximately 10 to 15 percent of the market share for this product in this region.

### 10.

At that time, Willamette bought Edwards' company, and as part of that agreement, Edwards agreed not to compete with Willamette for 10 years.

### 11.

Approximately three years after the non-compete agreement with Willamette concluded, Edwards began to develop and sell Patch in the market through his new company, EPPS, as he

observed that the cost of producing patch components seemed to have risen only 50 percent during the interim that he was not in the business while Willamette had raised the selling price of Patch approximately 250 percent.

12.

Further, Edwards realized that Willamette had become the sole seller of Patch, and he determined that the industry would probably embrace a second source in competition with Willamette.  Edwards also realized that the equipment Willamette had designed in the early 1990s to apply Patch had never been upgraded.  Edwards realized there was new technology available in this area, and he was confident that he could make improvements to the equipment used to apply Patch and that he would be able to outperform Willamette in both production efficiency and the quality of the end result.  Edwards realized that because Willamette had had little to no competition during the previous ten to twelve years, it had had no incentive to improve its application equipment.  If Willamette had upgraded its equipment, it would have had to discard the outdated equipment; however, because Willamette essentially had a complete monopoly for the prior decade, it enjoyed the economic advantage of keeping its original equipment in service.

**EPPS' ENTRY INTO THE PATCH MARKET**

13.

In July 2014, EPPS entered into a production contract with MARTCO, a plywood manufacturing company located in Chopin, Louisiana.  Pursuant to this contract, EPPS provided the Patch and application equipment for one of two production lines at the MARTCO plant.  At the time, EPPS was selling "A patch" for $15 per gallon while its competition, Willamette, had been selling the same product to MARTCO for $17 per gallon.  Plaintiff estimates its initial sales

to MARTCO for the one production line constituted approximately 10% of Patch sold in the relevant geographic market.

14.

MARTCO advised EPPS that based upon its lower price it would allow EPPS to take over the second Patch production line if Willamette did not lower its prices. EPPS encouraged MARTCO to allow it to sell Patch on both lines and offered MARTCO a five-year contract for "A" Patch at $12.90 per gallon. By picking up the second Patch line, EPPS could have raised its market share to approximately 20% in the relevant geographic market.

15.

Faced with real competition for the first time in more than a decade, Willamette desired to remove EPPS from the marketplace and to re-establish the monopoly it had on the Patch market. Accordingly, representatives of Willamette offered to MARTCO a substantial discount on all the items Willamette sold to MARTCO, other than Patch, including products that Willamette sold to MARTCO plants that did not even use Patch. The sole purpose of this discount was to undercut EPPS, force it from competition and to regain its monopoly in the Patch market.

16.

The discounts Willamette offered to MARTCO included a variety of other products sold by Willamette and also used throughout the wood processing industry. These products were not sold by EPPS and included, but were not limited to, edge seal, stencil ink, glue extender and sanding belts. The discounts offered were tied to a requirement that MARTCO purchase all of its Patch from Willamette.

17.

The sole purpose of the discount tying agreement offered by Willamette was to avoid competition on the merits for the sale of Patch.  Based upon Willamette's market power, MARTCO had little choice but to accept the discount tying agreement.

18.

It is reasonably believed and is averred that a similar discount tying agreement was offered to and accepted by Hood Industries, another manufacturer purchasing Patch.

19.

EPPS attempted to likewise offer a discount to MARTCO but was advised that the Willamette collective discount across the board was much greater than anything EPPS was able to offer.  When it became clear in the meeting between EPPS and MARTCO that EPPS would no longer be in business after losing its only customer and would not be available later to offer competitive pricing on Patch, MARTCO assured Edwards that it had protected itself "long term."

20.

As a result of the substantial discounts Willamette offered, MARTCO terminated its relationship with EPPS and advised EPPS to pick up and remove all its application equipment by April 23, 2015.  At no time during the period of July 2014 through April 23, 2015, had MARTCO indicated there was any problem with the quality of the product, performance of the application equipment,  or the service EPPS was providing to MARTCO.  In fact, EPPS was advised by MARTCO personnel that all aspects of its product and performance far exceeded expectations.  Indeed, the only intervening act that resulted in EPPS' termination was the substantial discount Willamette gave on all products sold to MARTCO.  This discount by

Willamette caused EPPS to lose its market share and returned Willamette to 100% market share of Patch sales in the relevant geographic market.

21.

EPPS reasonably believes and avers that when the substantial discounts on all items sold by Willamette to MARTCO are considered, MARTCO was buying its Patch at a price below Willamette's variable costs to produce it.  While Willamette did not discount the Patch itself, it used the substantial discount on all its other products to disguise the fact that it was selling Patch at below its variable costs in order to remove its sole competitor from the market.

**EPPS' ATTEMPT TO EXPAND IN THE MARKET**

22.

In early 2015, prior to being driven out of the Patch market by Willamette, EPPS' business with MARTCO had been going well, and EPPS had planned to expand its market to other customers.  Specifically, in February of 2015, EPPS had contacted Hood Industries and was invited to its plant to conduct a test run.  The test run went well, and EPPS was looking for approval to begin selling Patch to Hood Industries.

23.

In early April 2015, though, communications from Hood Industries suddenly ceased. Edwards began making inquiries as to what had happened, and he was advised by a representative of Hood Industries on April 14, 2015, that it had been offered and accepted a discount by Willamette on its products.

24.

So, although EPPS had performed well in the test run at Hood Industries, and Hood Industries seemed very receptive to purchasing Patch from EPPS, the discussions abruptly broke off after Willamette offered substantial discounts to Hood Industries.

25.

It is reasonably believed and averred that Willamette offered substantial discounts to Hood Industries, as it did to MARTCO, in order to prevent EPPS from becoming a competitor at the Hood Industries plant.  It is also reasonably believed and averred that this occurred with Coastal Plywood in Florida as well since all Edwards' discussions with Coastal about supplying Patch to Coastal were halted around the same time.

## SALE OF EPPS' ASSETS TO WILLAMETTE

26.

After its business relationship with MARTCO was terminated and after its attempts to enter into sales agreements with Hood Industries and Coastal Plywood were blocked, it was not financially viable for EPPS to continue business.

27.

Edwards then contacted the CEO of Willamette, John Harrison ("Harrison"), to ask him if he was aware that his company had taken action to put EPPS out of business.  Although Harrison claimed he had no knowledge of any of the particulars of MARTCO's decision to stop using EPPS, he advised he would check into it.  Subsequently, Harrison offered to purchase all of EPPS' equipment and to enter into a non-compete/consulting agreement with Edwards.

28.

Faced with insolvency, EPPS had no choice but to enter into an agreement for the sale of its business assets on June 17, 2015.  A consulting and non-competition agreement was entered into between Edwards and Willamette on the same date.

29.

Willamette entered into the agreement to purchase EPPS' assets for the purpose of maintaining its illegal monopoly well into the future.

30.

After EPPS was forced out of the marketplace, Willamette again established 100% of the product market for Patch in the defined geographic market.

31.

With its market power, Willamette can and will recoup its interim loss from below cost discounts, and its cost associated with purchasing EPPS' assets, with its future pricing of Patch.

**FIRST CLAIM FOR RELIEF**

(Sherman:  Illegally Establishing or Maintaining a Monopoly)

32.

Plaintiff, EPPS, reavers and realleges all the allegations in the paragraphs above as if set forth fully herein.

33.

By such acts, practices, and conduct, Willamette has unlawfully monopolized the patch product and technology market in violation of §2 of the Sherman Act, 15 U.S.C. §2.

34.

As a result of the aforementioned violation of §2 of the Sherman Act, 15 U.S.C. §2, Plaintiff has suffered significant monetary injury by reason of the acts, practices, and conduct of Willamette alleged above.

35.

Plaintiff is entitled to all damages related to Defendant's violation of the Sherman Act, including judgment for treble damages, attorney fees, and costs incurred in the prosecution of this matter.

## SECOND CLAIM FOR RELIEF

(Sherman:  Predatory Pricing to Maintain a Monopoly)

36.

Plaintiff reavers and realleges all the allegations of the above paragraphs as if set forth fully herein.

37.

Defendant, Willamette, has engaged in predatory pricing in order to achieve and/or maintain its monopoly in the Patch product market within the geographic market defined above. The acts of Defendant in engaging in such conduct are in violation of §2 of the Sherman Act, 15 U.S.C. §2.  Moreover, there is a substantial probability that Defendant will recoup its below cost pricing in the future.

38.

As a result of the acts of Defendant in engaging in the predatory pricing as described above, Plaintiff has been substantially injured in its business.  Plaintiff seeks monetary judgment

for all monetary losses.  Additionally, Plaintiff seeks judgment for treble damages, attorney fees, and costs incurred in the prosecution of this matter.

## THIRD CLAIM FOR RELIEF

(Merger or Acquisition to Establish or Maintain a Monopoly)

39.

EPPS reavers and realleges all the allegations of the above paragraphs as if set forth fully herein.

40.

The actions of Willamette in purchasing the assets of EPPS and requiring Edwards to enter into a non-compete agreement constitutes a violation of §2 of the Sherman Act, 15 U.S.C. §2, and §§4 and 7 of the Clayton Act, 15 U.S.C. §§15 and 18.  As a result of Willamette's acts, Plaintiff has been substantially damaged and seeks a monetary judgment for such damages. Additionally, Plaintiff seeks judgment for treble damages, attorney fees, and costs incurred in the prosecution of this matter.

## FOURTH CLAIM FOR RELIEF

(Anti-Tying:  Restraint of Trade)

41.

EPPS reavers and realleges all the allegations of the above paragraphs as if set forth fully herein.

42.

The aforementioned acts of Defendant, in offering discounts to customers conditioned on their purchasing the market product, constitute entering into illegal tying agreements resulting in a restraint of trade in violation of the Sherman Act 15 U.S.C. §§1 and 14.  Violations of said

sections by entering into an illegal tying agreement is a per se violation of the antitrust law.  As a result of this violation, Willamette achieved its intended goal to remove competition from the marketplace.

43.

As a result of the aforementioned violation of §§1 and 14 of the Sherman Act, 15 U.S.C. §§1 and 14, Plaintiff has suffered significant monetary injury by reason of the acts, practices and conduct of Willamette alleged above.

44.

Plaintiff is entitled to all damages related to Defendant's violation of the Sherman Act, including judgment for treble damages, attorney fees and costs incurred in the prosecution of this matter.

## FIFTH CLAIM FOR RELIEF

(Louisiana Antitrust:  Illegally Establishing or Maintaining a Monopoly;
Illegal Restraint of Trade)

45.

Plaintiff reavers and realleges all the allegations of the above paragraphs as if set forth fully herein.

46.

The aforementioned acts of Defendant constitute a violation of the Louisiana Antitrust Statute, La. R.S. 51:122, 51:123, and 51:124(A), as the acts of the Defendant attempt to obtain and/or maintain a monopoly illegally in violation of the Act.   Additionally, the acts of the Defendant constitute illegal tying in restraint of trade.  As a result of Willamette's acts, Plaintiff has been substantially damaged and seeks a monetary judgment for such damages.  Additionally,

Plaintiff seeks judgment for treble damages, attorney fees, and costs incurred in the prosecution of this matter pursuant to La. R.S. 51:137.

## SIXTH CLAIM FOR RELIEF

(Louisiana Unfair Trade Practices Act)

47.

Plaintiff reavers and realleges all the allegations of the above paragraphs as if set forth fully herein.

48.

The aforementioned acts of Willamette constitute a violation of the Louisiana Unfair Trade Practices Act (LUTPA), La. R.S. 51:1405(A) and 51:1409(A).  As a result of Defendant's acts, Plaintiff has been substantially damaged and seeks a monetary judgment for such damages, attorney fees, and costs incurred in the prosecution of this matter pursuant to La. R.S. 51:1409.

## STANDING AND DAMAGES

49.

The acts of the Defendant as alleged above were the sole cause of Plaintiff being forced out of business in the relevant geographic market.  The acts of the Defendant were undertaken intentionally for the purpose of driving a competitor from the marketplace for the market product, Patch.  Defendant's unlawful acts not only caused injury to competition but also were the cause of Plaintiff's monetary damages.

50.

Plaintiff's monetary damages include loss of past and future income and profit. Additionally, Plaintiff was injured when it sold its assets to the Defendant for less than market value.

51.

Plaintiff has done everything in its power to mitigate its loss, including selling its assets to the Defendant.

52.

Plaintiff, EPPS, prays there be trial by jury on all issues.

WHEREFORE, Plaintiff, Clean Water Opportunities, Inc. d/b/a Engineered Polyurethane Patching System, prays that this Complaint be filed into the record and be made a part thereof and that Defendant, The Willamette Valley Company, be duly cited to appear and answer same, and after all legal delays and due proceedings are had, there be judgment rendered herein in favor of Plaintiff and against Defendant for a money judgment for all damages proven, duly trebled under established law, together with legal interest thereon from date of suit (as to all state law claims) or from date of service of suit (as to all federal law claims), together with attorney fees, all costs of these proceedings, and other such relief as the Court deems just and proper. Plaintiff requests there be trial by jury on all issues.

Respectfully submitted,

/s/ Joseph R. Ward, Jr.
JOSEPH R. WARD, JR. (T.A.) (Bar #08166)
WARD & CONDREY, LLC
409 E. Boston Street, Suite 200
Covington, Louisiana 70433
Telephone:  (985) 871-5223
Facsimile:  (985) 871-5234
E-Mail:  jward@wardandcondrey.com

15

STACY R. PALOWSKY (Bar #25203)
PALOWSKY LAW, LLC
Mail:  249 Fairfield Oaks Dr.
Office:  210 Highway 21
Madisonville, Louisiana 70447
Telephone:  (985) 792-1567
Facsimile:  (985) 590-5230
E-Mail:  spalowsky@palowsky-law.com

Attorneys for Plaintiff, Clean Water Opportunities, Inc.  d/b/a  Engineered Polyurethane Patching Systems

**PLAINTIFF WILL SERVE DEFENDANT PURSUANT TO FRCP 4(h) AS FOLLOWS**:

The Willamette Valley Company
through its agent for service of process:
C T Corporation System
3867 Plaza Tower Dr.
Baton Rouge, LA 70816