**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

CLEAN WATER OPPORTUNITIES, INC.
D/B/A ENGINEERED POLYURETHANE
PATCHING SYSTEMS

                                  **CV. NO. 16-227-JWD-EWD**

VERSUS

                                  **JUDGE JOHN W. deGRAVELLES**

THE WILLIAMETTE VALLEY
COMPANY

## RULING AND ORDER

### I.      INTRODUCTION

Before the Court is a Motion to Dismiss the Amended and Restated Complaint ("Amended Complaint") for Failure to State a Claim filed by Defendant The Williamette Valley Company ("Defendant"). ("Motion," Doc. 40). Plaintiff Clean Water Opportunities, Inc., d/b/a Engineered Polyurethane Patching Systems ("Plaintiff") has filed an Opposition, (Doc. 48), and Defendant has filed a Reply in further support of the Motion, (Doc. 51).

For the reasons discussed below, the Motion is granted, and this action will be dismissed.

### II.      PLAINTIFF'S ALLEGATIONS AND PROCEDURAL BACKGROUND

This action concerns Defendant's alleged monopolization of the market for "patch," a product used to fill imperfections in mill-produced plywood. (Doc. 34 at 2-3). Patch is applied to sheets of plywood traveling down a conveyor belt at the rate of six to twelve sheets per minute and is applied by an employee using a "patch gun," which is a handheld piece of equipment that mixes the two components of patch. (*Id.* at 3). Patch is sold to manufacturers on a per-gallon basis, but, as part of the price, the seller provides and services patch application equipment. (*Id.*).

1

The American Plywood Association ("APA") is an industry-based governing organization that sets standards for different grades of plywood. (*Id.*). The APA also produces a guide for synthetic repairs that includes repair using patch. (*Id.*). The APA allows two other types of "veneer repair," namely "wood plug" and "wood dough" or "wood putty" repair. (*Id.* at 4). Wood plug repair requires that imperfections be punched out and ultimately re-inserted in sheets of plywood by hand, while wood dough repair's mechanical and reliability limits "render it 'not approved' for the majority of defects commonly found in panel faces today." (*Id.*). Wood dough repair also requires long drying time and may leave "residual cracks." (*Id.*). Therefore, according to Plaintiff, "there are no market substitutes for patch." (*Id.*).

Patch is a "disbursed suspension" with a functional shelf life of two to four weeks. (*Id.* at 5). This shelf life shortens when the suspension is agitated, "like it would be while being transported in a semi-bulk container on a flat-bed trailer (the standard method of delivery)." (*Id.*). Between patch's limited shelf life and the requirement that a patch seller service patch application equipment (including on an emergency basis), Plaintiff contends that the relevant geographic market in this action includes patch users within a five-hundred-mile, six-hour drive radius around Baton Rouge, Louisiana. (*Id.* at 5-6). This corresponds with a "Southern Market" for patch allegedly "defined" by Defendant, which includes east Texas, Louisiana, Mississippi, Alabama, southern Arkansas, and the Florida panhandle. (*Id.* at 5).

Defendant is the sole supplier of patch in the continental United States. (*Id.* at 6). Defendant installs patch application equipment where patch is sold, but it does not allow others to purchase the equipment, which is not commercially sold, nor will it supply data to others on how to build it. (*Id.* at 6-7). Additionally, only two companies have the equipment to make patch "mixing tubes," and, to purchase them at a low enough price to be competitive, a supplier "would

have to purchase a minimum of 10,000." (*Id.* at 7). One component of patch is a "non-standard" formula within the polyurethane industry that a new manufacturer would need to develop independently, and this component must meet numerous performance standards. (*Id.*). The other component is available "off the shelf" but there are "hundreds of varian[ts]" that a potential supplier would need to try, and the component is costly to store and ship. (*Id.* at 7-8).

To make patch, raw materials must be purchased, and these raw materials must be obtained at competitive prices to make the sale of patch economically feasible. (*Id.* at 8). "[S]ome of the better choices in raw materials" are also "essentially unavailable" because Defendant uses them. (*Id.*).

A patch supplier must also have APA approval to operate in a mill, and approval to operate industry-wide is contingent upon three tests of a supplier's patch and equipment at three different mills. (*Id.* at 8-9).

Plaintiff also alleges, "perhaps most importantly," that the "mere suggestion" that Defendant will no longer supply patch to a particular mill will, "in virtually all cases," be sufficient to stop a mill from using a different supplier. (*Id.* at 9).

In 1990, Plaintiff's principal owner, David Edwards, entered into the business of supplying patch to mills. (*Id.*). At that time, there were several companies in the market for providing patch; however, by 1997 or 1998, only Edwards's former company and Defendant remained. (*Id.* at 10). In 2000, Defendant bought Edwards's former company, which was then enjoying 10 to 15 percent market share, and Edwards signed a ten-year noncompete agreement. (*Id.*).

Spurred either by Defendant raising prices or by mills becoming concerned about Defendant's monopoly, a competitor entered the market nine months after Defendant first

established its monopoly. (*Id.*). The competitor was "viable" for about a year before Defendant bought it out. (*Id.*).

About three years after the noncompete agreement ended, Edwards began developing and selling patch through Plaintiff, his new company. (*Id.*). Edwards reentered the market after observing that, while he had been out of the market, the cost of patch components had risen fifty percent but the selling price of patch had risen 250 percent. (*Id.* at 10-11). He also thought the industry would "embrace a second source" for patch and believed he could make cost-saving technological improvements to patch application equipment. (*Id.* at 11).

In July 2014, Plaintiff entered into a production contract with MARTCO, a plywood manufacturer, under which Plaintiff would provide patch and application equipment for one of two production lines at MARTCO's plant. (*Id.*). At that time, Plaintiff was selling patch for $15 per gallon and Defendant was selling patch for $17 per gallon. (*Id.*). At some point, MARTCO advised Plaintiff that Plaintiff would be permitted to take over a second production line if Defendant did not lower its prices. (*Id.* at 12). Plaintiff "encouraged" MARTCO to allow it to sell patch on both lines and offered a five-year contract at $12.90 per gallon. (*Id.*).

Defendant then offered MARTCO "substantial discount[s]" on all items Defendant sold MARTCO, including ones that did not use patch, with the contingency that MARTCO purchase all patch from Defendant and for the purpose of undercutting Plaintiff. (*Id.*). Plaintiff "reasonably believes and avers that," when these discounts are considered, MARTCO was buying patch at a price below Defendant's variable costs of production. (*Id.* at 14).

Plaintiff also offered MARTCO a discount but was advised that it would be unable to match Defendant's discount. (*Id.* at 13). In a meeting between representatives of MARTCO and Plaintiff, MARTCO assured Edwards that it was protected "long term." (*Id.*). MARTCO terminated its

relationship with Plaintiff and required Plaintiff to remove its patch application equipment by April 23, 2015. (*Id.*). Plaintiff believes that similar discount agreements were accepted by two other manufacturers with which Plaintiff had been in discussions about supplying patch. (*Id.* at 13-15).

In June 2015, because it had been unable to enter into sales agreements with patch customers and Plaintiff was not "financially viable," Plaintiff's assets were sold to Defendant. (*Id.* at 15-16).

Plaintiff claims that, based on the prevailing price of patch when Defendant last had significant competition, the current competitive price of patch should be around $10 per gallon, not the $17 per gallon actually charged. (*See id.* at 16). This difference is passed on to plywood consumers. (*Id.* at 17).

Plaintiff claims that Defendant engaged in illegal conduct to maintain its monopoly, including predatory pricing, threatening termination of its relationships with mills that did business with Plaintiff, and an unlawful merger. (*Id.* at 17-18). Plaintiff alleges violations of the Sherman Antitrust Act, 15 U.S.C. § 2; the Clayton Antitrust Act, 15 U.S.C. §§ 4, 7; and the Louisiana Antitrust Statute, La. R.S. 51:122, 51:123, 51:124(A). (*Id.* at 18-20).

Plaintiff's original Complaint raised many of the same claims. The Court dismissed the Complaint on March 30, 2017, ruling that Plaintiff had failed to address barriers to entry to the market for patch and sufficiently define the relevant market, both in geographic terms and in terms of possible substitutes for patch. (Doc. 33 at 4-7, 9). The Court also granted leave to amend "to the extent Plaintiff finds it necessary to amend its complaint to specifically allege *how* Defendant's conduct was unlawful." (*Id.* at 9). The Court further observed that Plaintiff's "illegal acquisition" claim could not be maintained absent its other claims, as Plaintiff was required to show that

Defendant's anticompetitive conduct was the but-for cause of Plaintiff's acquisition. (*Id.* at 11-12).

## III.    DISCUSSION

### A.  General Standards

In *Johnson v. City of Shelby, Miss.,* ⸺ U.S. ⸺, 135 S. Ct. 346 (2014), the Supreme Court explained that "[f]ederal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." 135 S.Ct. at 346–47 (citation omitted).

Interpreting Rule 8(a), the Fifth Circuit has explained:

The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)]; *Twombly,* [550] U.S. at 556, 127 S. Ct. at 1965. This analysis is not substantively different from that set forth in *Lormand, supra,* nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without

discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand,* 565 F.3d at 257; *Twombly,* [550] U.S. at 556, 127 S. Ct. at 1965.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.,* 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

More recently, in *Thompson v. City of Waco, Tex.,* 764 F.3d 500 (5th Cir. 2014), the Fifth Circuit summarized the standard for a Rule 12(b)(6) motion:

We accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff . . . To survive dismissal, a plaintiff must plead enough facts to state a claim for relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Our task, then, is to determine whether the plaintiff state a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.

*Id.* at 502–03 (citations and internal quotations omitted).

### B. Parties' Arguments

#### i. Defendant's Motion

Defendant argues that the Amended Complaint "adds new allegations" but does not save Plaintiff's "core predatory pricing claim." (Doc. 40-1 at 1). First, Defendant argues that Plaintiff's predatory pricing claims are conclusorily pled and are, in fact, undercut by the facts that Plaintiff has provided. (*Id.* at 8). Defendant observes that, according to the Amended Complaint, the current competitive price of patch should be around $10 per gallon, which includes both the variable cost associated with the gallon of patch and a share of profit, fixed costs, and overhead, including the equipment and repair costs that a patch supplier covers. (*Id.* at 8-9). To state a predatory pricing claim, Defendant argues, Plaintiff must show that Defendant priced patch below its incremental costs, represented by variable costs, *i.e.*, "substantially below" $10 per gallon. (*Id.*). Plaintiff's factual allegations concerning predatory pricing allege that Defendant undercut

the price Plaintiff offered to MARTCO, which was $12.90 per gallon. (*Id.* at 9). Defendant believes it "utterly implausible" that, in response to Plaintiff's bid of $12.90 per gallon, Defendant not only undercut Plaintiff's price, but unnecessarily undercut Plaintiff's price to a point substantially below $10 and lost money on every gallon. (*Id.*). Defendant also observes that Plaintiff has provided no specifics about its own incremental costs of producing patch or other information that would permit the Court to draw the conclusion that Defendant may have priced below incremental cost. (*Id.* at 10).

Second, Defendant argues that Plaintiff has not shown a "dangerous probability" that Defendant will recoup any losses incurred as a result of predatory pricing. (*Id.*). According to Defendant, the Amended Complaint describes multiple instances in which a new competitor entered the market for patch, Plaintiff has not shown that any alleged barriers to entry affect Defendant more than a new entrant into the market, numerous listed "barriers to entry" are overstated or not legally relevant (*e.g.*, that a competitor must develop and manufacture a product it wishes to sell), and Defendant's presence in the market is not itself a barrier to entry. (*Id.* at 12-15).

Third, Defendant argues that Plaintiff has insufficiently defined the market in this case. (*Id.* at 15). With respect to the product market, Defendant attaches as exhibits APA guides which approve of the use of wood putty in certain instances and also permit the use of epoxies, which the Amended Complaint does not discuss. (*Id.* at 15-16). Defendant also argues that the qualitative differences between patch and other means of filling imperfections does not place these products in different markets. (*Id.* at 16). With respect to the geographic market, Defendant argues that the relevant question is "how far consumers will go to obtain the product or its substitute," not where the customers or sellers are located. (*Id.* at 17-18).

Finally, Defendant argues that Plaintiff's illegal acquisition claims and its "catchall" claims under federal and Louisiana law should be dismissed for the reasons discussed in the Court's prior order. (*Id.*at 18-19).

### ii. Plaintiff's Opposition

In opposition, Plaintiff first observes that no discovery has occurred in this action, it does not have access to Defendant's cost and pricing information, and its plausible allegations must be accepted as true. (Doc. 48 at 5). Plaintiff also argues that a predatory pricing claim may be viable even absent an allegation that a monopolist priced below cost. (*Id.* at 5-8).

With respect to barriers to entry, Plaintiff maintains that, because Defendant has been in the market since 1990, it is "firmly established" and does not have to overcome the barriers discussed by Plaintiff to enter the market. (*Id.* at 8-9). Plaintiff also argues that the limited entry into the patch market since 1990 does not show limited barriers to entry and that Edwards had particular expertise that permitted his companies to enter the market. (*Id.*).

With respect to the product market, Plaintiff argues that there are no substitutes for patch "when it comes to high-volume sanded plywood production." (*Id.* at 10). Plaintiff also asks that the Court not consider the APA guides attached to the Motion, which it contends may not be considered at this stage and could only be properly understood if accompanied by testimony concerning the differences between patch and its various alleged substitutes. (*Id.* at 10-12).

With respect to the geographic market, Plaintiff reiterates the allegations in the Amended Complaint, arguing that it answered the "questions" posed in the Court's prior order and that the market for patch is a function of the distance between a patch supplier and its customers. (*Id.* at 12-13).

9

Plaintiff further argues that its Amended Complaint sets forth factual allegations showing that Defendant's "anticompetitive activities" led to the sale of Plaintiff to Defendant. (*Id.* at 13). Finally, Plaintiff argues that its remaining claims are not "catch-all" claims and should be permitted to stand alone regardless of the merits of the predatory pricing claims. (*Id.* at 13-14).

### iii. Defendant's Reply

In its Reply, Defendant reiterates some arguments made in its Motion and further argues that: (1) following the Supreme Court's decision in *Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), only below-cost prices suffice to state a predatory pricing claim; (2) the fact that an incumbent incurred entry costs years earlier does not demonstrate that costs incurred by new entrants significantly exceed the costs incurred by a monopolist; (3) the Court may consider the APA documents attached to the Motion; (4) the distance between a patch supplier and consumer is a relevant factor in defining the product market, but it is not the only factor; and (5) the Court's previous rulings warrant dismissal of the illegal acquisition claim and the alleged "catchall" claims. (Doc. 51 at 1-6).

### C. Analysis

### i. Predatory Pricing

"Predatory pricing occurs when '[a] business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market.'" *Big River Indus., Inc. v. Headwaters Resources, Inc.*, 971 F. Supp. 2d 609, 619 (M.D. La. 2013) (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 221 (1993)). The United States Supreme Court has cautioned that such claims should be approached with "extreme skepticism," as "[t]he central difficulty with such actions is that the conduct alleged is difficult to distinguish from conduct that benefits consumers." *Stearns*

*Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 527 (5th Cir. 1999) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)).

Preliminarily, the parties dispute whether a predatory pricing claim requires allegations that an alleged monopolist priced below incremental cost. According to Plaintiff, a predatory pricing claim may also rely on a "limit pricing" theory, under which a monopolist sets a price "just below that which a prospective entrant to the market would need to charge in order to sustain a successful entry." (Doc. 48 at 7 (citing *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 101 (5th Cir. 1988); *Dimmitt Agri Industries, Inc. v. CPC Intern, Inc.*, 679 F.2d 516, 524 (5th Cir. 1982)). However, *Stearns*, interpreting *Brooke Group*, forecloses this argument:

> Under *Brooke Group,* a claimant must demonstrate that the prices at issue were below an appropriate measure of its rival's costs. Stearns incorrectly relies on cases in this Circuit predating *Brooke Group,* in which we left open the possibility that prices above a monopolist's variable costs could be predatory under certain circumstances. The district court case from which Stearns extracts its predatory pricing standard was decided in the same month as, but before, *Brooke Group.* In the wake of *Brooke Group's* clarification of the standard, a plaintiff must show pricing below the standard this Court has long embraced as an appropriate measure of cost - average variable cost.

*Stearns*, 170 F.3d at 532 (citations omitted). Plaintiff argues that "[t]he cases relied on by [Defendant] do not involve 100-percent monopolists and consequently are legally and factually distinguishable," (Doc. 48 at 6), but it provides no argument or analysis that would permit the Court to depart from the clear standard set forth in *Stearns* and *Brooke Group*. Therefore, to succeed on a predatory pricing claim, a plaintiff must demonstrate: "(1) the defendant's pricing is below an appropriate measure of its costs, and (2) there is a dangerous probability that the defendant will recoup any losses sustained during the below-cost pricing period." *Big River*, 971 F. Supp. 2d at 619 (citing *Brooke Group*, 509 U.S. at 222-24).

With respect to the first element, Plaintiff's allegations of pricing below variable cost are implausible. The only instance of "predatory pricing" alleged with specificity in the Amended

11

Complaint is in Defendant's dealings with MARTCO. At most, these factual allegations support an inference that, when discounts are considered, Defendant offered MARTCO a price somewhere below $12.90 per gallon, the price offered by Plaintiff. (Doc. 34 at 12). According to Plaintiff's allegations, however, the competitive price for patch "should be" about $10 per gallon. (*Id.* at 16). Moreover, as Defendant observes, if a patch supplier is to remain viable, the per-gallon price must include both the variable cost of producing the unit and a contribution to fixed costs and any profit to be realized. (Doc. 40-1 at 8-10). It is unclear exactly what the variable cost of a gallon of patch is, but it is wholly speculative that Defendant reduced its price not only below Plaintiff's offered price, but unnecessarily reduced it below variable cost in order to drive Plaintiff out of the market. Absent such a plausible allegation, Plaintiff's predatory pricing claim fails.

In an abundance of caution, the Court also considers Defendant's ability to recoup losses that it might have incurred. To plead a plausible claim for recoupment, the pleadings must plausibly allege that: (1) the predatory pricing scheme could actually drive the competitor out of the market and (2) the surviving monopolist could then raise prices to consumers so as to recoup his costs without encouraging new entrants to the market. *Big River*, 971 F. Supp. 2d at 619. As Judge Brady explained in *Felder's Collision Parts, Inc. v. Gen. Motors Co.*,

> The second prong assesses the probability of whether Defendants could charge supracompetitive prices for a period of time long enough to recoup profit lost as a result of the challenged program. The object of this inquiry is to determine the likelihood of a predator's success in achieving the end goal of any predatory plan—net profit. Courts will not condemn behavior where it appears likely that a predator's plan will fail to be profitable, because such behavior "produces lower aggregate prices in the market, and consumer welfare is enhanced."

960 F. Supp. 2d 617, 632 (M.D. La. Apr. 17, 2013) (citing *Brooke Group*, 509 U.S. at 224). An important market factor to consider at this stage is, "[i]f barriers to entry in an industry are low, new entrants into the industry will appear when the monopolist raises its prices, and the net effect

12

of the campaign will be a loss to the predator…" *Id.* at 633 (citing *Stearns*, 170 F.3d at 530). In evaluating the barriers to entry, the relevant inquiry focuses on market conditions after the defendant eliminates the plaintiff from the relevant market and what will stop other competitors from entering the market once the defendant begins to raise its prices. *See Stearns*, 170 F.3d at 530. As the Court previously discussed, a barrier to the market must affect a new entrant significantly more than a monopolist, and contentions that Defendant's mere existence is a barrier are "unavailing." (Doc. 33 at 4-5 (citing *Stearns*, 170 F.3d at 530; *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 119 n.15 (1986)); *see also United States v. Syufy Enterprises*, 903 F.2d 659, 668 (9th Cir. 1990) ("The government is not claiming that Syufy monopolized the market by being too efficient, but that Syufy's effectiveness as a competitor creates a structural barrier to entry, rendering illicit Syufy's acquisition of its competitors' screens. We hasten to sever this new branch that the government has caused to sprout from the moribund *Alcoa* trunk.").

The Court agrees with Defendant that Plaintiff's alleged barriers to entry generally do not satisfy the applicable legal standards. In particular, the fact that Defendant may have surmounted these "barriers to entry" years ago does not transform them into legally significant barriers. *See HTI Health Servs., Inc. v. Quorum Health Grp., Inc.*, 960 F. Supp. 1104, 1133 (S.D. Miss. 1997) ("This record contains no evidence whatsoever of new primary care physicians incurring longterm costs that *were not incurred* by already-established physicians." (emphasis added)); *E. Portland Imaging Ctr., P.C. v. Providence Health Sys.-Oregon*, 280 F. App'x 584, 586 (9th Cir. 2008) ("Plaintiffs have failed to create a factual issue regarding the barriers to entry and expansion in the diagnostic imaging market. They have not provided evidence that new entrants face long-run costs that *were not* or will not be incurred by incumbent providers." (emphasis added)); *Moecker v. Honeywell Int'l, Inc.,* 144 F. Supp. 2d 1291, 1308 (M.D. Fla. 2001) ("The disadvantage of new

entrants as compared to incumbents is the hallmark of an entry barrier. However, the mere fact that entry requires a large absolute expenditure of funds does not constitute a 'barrier to entry'; a new entrant is disadvantaged only to the extent that he must pay more to attract those funds than would an established firm." (citations omitted)); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) ("The main sources of entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale."); *see also Advo, Inc. v. Philadelphia Newspapers, Inc.,* 51 F.3d 1191, 1202 (3d Cir. 1995) (disapproving of argument implying that there are legally significant barriers to entry in all markets).

While Court must accept as true that the barriers alleged by Plaintiff exist, (*see* Doc. 48 at 8-9), the Court need not accept Plaintiff's conclusions about the legal significance of these barriers. The vast majority of these barriers were satisfied by Defendant at some time in the past, and the few that were not (*e.g.*, Plaintiff's allegation that "some of the better choices in raw materials are essentially unavailable because [Defendant] uses them") are conclusory. Moreover, while the Court acknowledges Plaintiff's argument that actual entry has been fairly limited and requires some special expertise, (Doc. 48 at 8-9), it is significant that the Amended Complaint acknowledges some actual entry in a "100 percent monopoly" market in response to rising prices, one instance of which occurred only nine months after the monopoly was first established. (Doc. 34 at 10-11). Under the circumstances, the Court cannot conclude that Plaintiff has plausibly pled legally significant barriers to entry, and Plaintiff's predatory pricing claims fail for this additional reason.

### ii. Illegal Acquisition Count

The Court previously ruled that Plaintiff's voluntary withdrawal from the market cannot give rise to an unlawful acquisition claim and that such a claim would generally "rise and fall" with Plaintiff's predatory pricing claim. (Doc. 33 at 10-12 (citing, *inter alia*, *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1235 (6th Cir. 1981)). That is, Plaintiff was required to show some anticompetitive conduct by Defendant that was the but-for cause of Plaintiff's insolvency. (*Id.* at 11-12).

With respect to this claim, the Amended Complaint suffers from the same defects as the initial Complaint: although it contains legal conclusions that Defendant's actions were the sole cause of Plaintiff's sale to Defendant, the only specific facts concerning anticompetitive conduct are those that the Court analyzed *supra* in connection with Plaintiff's predatory pricing claim. (*See* Doc. 34 at 20). Because these allegations are lacking, there are no plausible allegations that anticompetitive conduct by Defendant caused the sale. Plaintiff's illegal acquisition claim therefore fails and will be dismissed.

### iii. Remaining Claims

Plaintiff's first ground for relief reiterates all of the preceding paragraphs of the Amended Complaint and alleges that, "[b]y such acts, practices, and conduct," Defendant violated § 2 of the Sherman Act. (Doc. 34 at 18). The Court previously dismissed a virtually identical allegation claiming a "general violation" of § 2, citing favorably Defendant's argument that "where no piece of conduct is illegal, adding them together doesn't magically transform them into actionable conduct." (*See* Doc. 33 at 13); *see also Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 486 F. App'x 186, 191 (2d Cir. 2012) ("Because these alleged instances of misconduct are not independently anti-competitive, we conclude that they are not cumulatively anti-competitive

either."). Defendant's Motion argues that this "catchall" count should be dismissed again for the same reasons. (Doc. 40-1 at 19). Plaintiff argues that this claim is "separate and apart" from its predatory pricing and illegal acquisition claim, "as it is obvious, and has not been denied by [Defendant], that it maintains a pure monopoly over patch in the subject geographic market." (Doc. 48 at 13-14). However, as Plaintiff also observes, "the offense of monopoly . . . has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." (*Id.* at 13 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). Plaintiff again lacks plausible allegations of anticompetitive conduct (especially ones distinct from its predatory pricing claim) sufficient to satisfy the second element of this test. Therefore, Plaintiff's first claim for relief is inadequately pled and will be dismissed.

Finally, Plaintiff invokes Louisiana antitrust law on the same grounds as his federal claims. (Doc. 34 at 20; Doc. 48 at 14). The Court has previously ruled that Louisiana antitrust law mirrors federal antitrust law. (Doc. 33 at 14). Because Plaintiff's federal claims are lacking, Plaintiff's claims under Louisiana antitrust law are similarly dismissed.

### iv. Leave to Amend

The Court now considers whether to grant further leave to amend. In a recent antitrust case, the Fifth Circuit described the standard as follows:

> "Rule 15(a) requires a trial court to grant leave to amend freely, and the language of this rule evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., LP*, 427 F.3d 987, 994 (5th Cir. 2005) (citation and internal quotation marks omitted). Leave to amend is in no way automatic, but the district court must possess a "substantial reason" to deny a party's request for leave to amend. *Id.* (citation and internal quotation marks omitted). The district court is entrusted with the discretion to grant or deny a motion to amend and may consider a variety of factors including "undue delay, bad faith or dilatory motive on the part of the

16

movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ..., and futility of the amendment." *Id.* (citation omitted). "In light of the presumption in favor of allowing pleading amendments, courts of appeals routinely hold that a district court's failure to provide an adequate explanation to support its denial of leave to amend justifies reversal." *Mayeaux v. La. Health Serv. and Indent. Co.*, 376 F.3d 420, 426 (5th Cir. 2004) (citation omitted). However, when the justification for the denial is "readily apparent," a failure to explain "is unfortunate but not fatal to affirmance if the record reflects ample and obvious grounds for denying leave to amend." *Id.* (citation and internal quotation marks omitted).

Denying a motion to amend is not an abuse of discretion if allowing an amendment would be futile. *Briggs v. Miss.*, 331 F.3d 499, 508 (5th Cir. 2003). An amendment is futile if it would fail to survive a Rule 12(b)(6) motion. *Id.* Therefore, we review the proposed amended complaint under "the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000) (citation internal and quotation marks omitted).

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014).

The Fifth Circuit has also stated:

In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

Relying on *Great Plains* and other cases from this circuit, one district court in Texas articulated

the standard as follows:

When a complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend before dismissing the action with prejudice unless it is clear that the defects in the complaint are incurable. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 329 (5th Cir. 2002); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.,* 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion.") (internal citation omitted). However, a court may deny leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face." 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1487 (2d ed.1990)

17

(footnote omitted); *see also Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.,* 195 F.3d 765, 771 (5th Cir. 1999) ("A district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.") (footnote omitted).

*Tow v. Amegy Bank N.A.*, 498 B.R. 757, 765 (S.D. Tex. 2013). Finally, one leading treatise explains:

> As [] numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. A district court's refusal to allow leave to amend is reviewed for abuse of discretion by the court of appeals. A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

5B Charles A. Wright, Arthur R. Miller, *et al.*, *Federal Practice and Procedure* § 1357 (3d ed. 2016).

Here, acting in accordance with "wise judicial practice," the Court previously afforded Plaintiff an opportunity to file an Amended Complaint. After reviewing the Amended Complaint and the briefing on the Motion, the Court concludes that granting further leave to amend would be futile. Significantly, the Amended Complaint confirms that Plaintiff's specific factual allegations center on its dealings with MARTCO and Defendant's alleged attempts to undercut Plaintiff's price. After two iterations, Plaintiff has been unable to provide facts plausibly suggesting that Defendant's conduct may have constituted predatory pricing; indeed, the Amended Complaint renders Plaintiff's claims *less* plausible by clarifying the broad range of prices that would have undercut Plaintiff's price but remained well above variable cost. As discussed above, Plaintiff's

predatory pricing claims are necessary to his other claims.  It appears that Plaintiff will be unable to amend to state a viable claim.  The Court therefore dismisses Plaintiff's claims without further leave to amend.[1]

### D.  CONCLUSION

Accordingly, **IT IS ORDERED** that Defendant's Motion (Doc. 40) is **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE.**  Judgement will be entered consistent with this order.

Signed in Baton Rouge, Louisiana, on <u>February 6, 2018</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[1] In light of this ruling, the Court need not consider the sufficiency of Plaintiff's definition of the relevant product or geographic markets.